ROOT (GOODYEAR DENTAL VULCANITE CO. v.). See Case No. 5,597.

ROOT v. HILLIARD. See Case No. 539.

ROOT (JOHNSON v.). See Cases Nos. 7,-409–7,411.

ROOT (MORTON v.). See Case No. 9,866.

———

## Case No. 12,038.

### ROOT v. SHIELDS.

[Woolw. 340.] [1]

Circuit Court, D. Nebraska. Nov. Term, 1868.

PUBLIC LANDS—PRE-EMPTION—RESIDENCE — COMBINATION TO PREVENT COMPETITION — MUNICIPAL CORPORATION—LAND PURCHASE.

1. A party who goes into possession of a small parcel of a tract of government land, under a claim of right inconsistent with a pre-emption claim; who sells and repurchases the property as town lots; who, in a document wherein he is required to state his residence, states it as being elsewhere; who removes. and remains long absent from the land; and who, from the first, never asserts any pre-emption right to the tract,—cannot be deemed to have intended to claim such right.

[Cited in Helfenstein v. Reed, 10 C. C. A. 327, 62 Fed. 217.]

2. A party who is not himself injured thereby cannot defeat the title of the purchaser at a sale by auction of public land, by showing that a combination to prevent competition in bidding was formed by means of which persons were prevented from bidding, and the land, worth at the time $50 per acre, was obtained for $1.25 per acre

[Cited in Houck v. Kelsey, 17 Kan. 335.]

3. At the common law, a municipal corporation can take and hold the title to such lands only as its necessities require; nor can it take the title in another's name, in trust for itself. This rule is changed in Nebraska by statute.

4. The objection at the common law would avoid the trust, and leave the title in the trustee, discharged of all duty to the corporation, and subject to be disposed of by him, if he held by a deed absolute on its face, and paid the consideration, and the trust were evidenced only by agreement between him and the corporation.

5. A pre-emption entry, not affected by a radical infirmity, will be upheld as against a subsequent purchaser.

6. Lands included within the limits of an incorporated town are not subject to entry under the pre-emption law of September 4, 1841 (5 Stat. 453).

7. This provision of the statute affords no room for the mischief of including lands within the limits of a city, in order to exclude them from the operation of the law.

8. The provision is not repealed by the organic act, providing that the legislature of the territory of Nebraska shall not interfere with the primary disposal of the soil (10 Stat. 277).

9. This language has been used for over fifty years in acts admitting new states into the Union, and their power to incorporate towns on the public lands was never questioned. Argu.

10. The withdrawal of the lands from the operation of the pre-emption law is the effect of the act of congress, and not of the municipal charter. Argu.

11. The provision of the organic act was aimed at a direct claim of proprietorship on the part of the territory. Argu.

12. The extent of land which may be included within a city is not limited by the act of May 23, 1844 (5 Stat. 657), providing for the corporate authorities pre-empting for the citizens 320 acres of the town-site.

13. The provision excepting such lands from the operation of the pre-emption act was inserted, as were other exceptions, to secure to the government the enhanced value of lands in and adjoining a town.

[Cited in Houlton v. Chicago, St. P., M. & O. Ry. Co., 86 Wis. 63, 56 N. W. 337.]

14. Circumstances tending to establish a fact, held to be insufficient to countervail the positive denial in the answer.

15. Although they have purchased without any knowledge, in fact, of any defect in their title, yet parties will not be protected as bona fide purchasers (1) who purchased before the patent of the government issued, because, until then, the fee is in the United States, and the

[1] [Reported by James M. Woolworth, Esq., and here reprinted by permission.]

pre-emptor and his grantees hold only an equity; (2) when the defect arises out of a rule of law of which they are bound to take notice; (3) when the title acquired is absolutely void.

[Cited in Burfenning v. Chicago, St. P., M. & O. Ry. Co., 46 Minn. 22, 48 N. W. 445; Taylor v. Weston, 77 Cal. 540, 20 Pac. 65.]

This was a bill in chancery, filed originally in the district court of the late territory of Nebraska. The plaintiff having had a decree there, the defendants carried it by appeal to the supreme court of the territory, where it was pending when the state was admitted into the Union. The plaintiff being a citizen of Nebraska, and the defendants citizens of other states, the cause was removed into this court, and heard here upon the transcript of the record of the district court, filed in the supreme court.

In 1854, certain parties having associated themselves together as a joint-stock company, under the name of the Omaha City Company, surveyed and platted into lots certain portions of the public lands as an addition to the city of Omaha, and among others, the west half of the south-west quarter of section 10, and the north half of the north-west quarter of section 15, in township 15 north, range 13 east of the sixth principal meridian. This company issued to different parties certificates, setting forth that the holders thereof respectively would be entitled to twenty lots. The defendant Shields was the holder of one of these certificates; and when the company divided the lots among the holders of the certificates, he received ten, situated in block 128½. Under this title he entered upon these lots in 1855, and built a house thereon, and ran a fence around them on the line between them and the streets. He lived in this house with his family until June, 1856, when he sold the property to one Beesom, describing it in the deed of conveyance as lots in the above named addition to the town, and by the numbers by which they were designated on this plat, and by which he had drawn them. He then removed to Omaha, where he lived for a while, when he settled on another tract of land in the neighboring county of Sarpy. While residing there, he filed in the office of the register of the land office a written statement of his declaration of intention to pre-empt said lands, under the act of September 4, 1841 [5 Stat. 453], and in this declaratory statement he described himself as "of the county of Sarpy." He continued to reside here until September, 1857, when he re-purchased from Beesom the lots above mentioned, they being in the re-conveyance described as in the former deed. The plaintiff alleges that he did this in pursuance of an agreement with, and with money furnished by, the defendant Test, which the defendants deny. He then removed to the property into the house he had previously built, but made no other improvements: and immediately thereupon he filed in the register's office his written declaration of intention to pre-empt the tract first above described, under the act of September 4, 1841 [supra], in which statement he alleged a settlement in April, 1856, that being the time when he built the house and first removed to the tract. On the 21st of November following, he made proof to the satisfaction of the register and receiver of such matters as are required by law to be shown to them to entitle applicants to pre-empt lands; and he took the oath prescribed in that behalf, and entered the land under the act, receiving the usual patent certificate. The bill alleges, and the defendants deny, that this was in pursuance of an agreement between him and Test, and that he should deed a part of the land to him. On the 23d of the same month he conveyed to Test an undivided half of the whole quarter section thus pre-empted by him, as is alleged in execution of said agreement; and in the following January he conveyed the other undivided half to the defendant Smith. After this the commissioner of the general land office returned the case to the local office, and directed a rigid re-investigation of Shield's pre-emption right in the tract. This took place in May; and, upon voluminous testimony adduced in support of and adversely to the right, the local office found against the entry, and so reported to the commissioner. He affirmed this decision, and the parties holding under Shields, in his name, appealed to the secretary of the interior, who was at that time the Honorable Jacob Thompson. That officer affirmed the previous decisions; and in pursuance of his order in that behalf, the entry made by Shields was vacated. This was on the 5th of May, 1860: but on the 13th of December, 1861, the Honorable Caleb Smith, having succeeded Mr. Thompson in the interior department, without notice to any party, reversed the former decision of his office; decided in favor of Shields' pre-emption right; and directed a patent to issue to him, which was done.

Such was the history of the title as it stood in the defendants. The connection of the plaintiff with the title was this: After Mr. Secretary Thompson had decided adversely to Shields' right, and after the entry which he in 1857 had made was cancelled, and before Mr. Secretary Smith had come into office, the land was by the commissioner ordered to be sold at public auction, on thirty days' notice, as a disconnected tract; and on the 10th of July, 1860, it was accordingly sold, a part to one Monell, and a part to one Smith. Monell did not purchase on his own behalf, but in trust, partly for those who held deeds to lots from the Omaha City Company, and partly for the city. The plaintiff held deeds to some of the lots, and purchased from the city other portions of the tract, and Monell accordingly conveyed them to him.

Between the time Shields conveyed the lots to Beesom and removed from the tract to Omaha, and the time he re-purchased them and returned to his former home, that is to say, on the 14th of February, 1857, the legis-

lature of Nebraska incorporated the city of Omaha. This tract of land, and also some 3000 acres besides, were included within the corporate limits of the city. In March of that year, its authorities, under the act of May 23, 1844 [5 Stat. 456], entered at the land office as the town-site 320 acres. From this tract that first mentioned was more than a mile distant. It had never been occupied for any other than agricultural purposes.

The objections taken by the plaintiff to Shields' entry were:

1. That in point of fact Shields never settled on the tract, with the view of pre-empting it, until September, 1857; that at that time it was included within the limits of an incorporated city, and, by force of the act, excluded from its operation.

The clause on which this position was rested was as follows: "Section 10. Every person, being the head of a family," &c., who shall "make in person a settlement upon the public lands," &c., "and who shall inhabit and. improve the same, and who has or shall erect a dwelling thereon, shall be and is hereby authorized to enter with the register of the land office," &c., "a quarter section of land, to include the residence of such claimant, upon paying to the United States the minimum price of such land, subject, however, to the following limitations and exceptions: . . . no sections or fractions of sections included within the limits of any incorporated town."

2. That Shields effected his entry for speculative purposes, and in pursuance of a contract previously made with Test to convey a part of it to him: and it was claimed that this avoided the entry, by force of the 13th section, which required every person, before making the entry, to take an oath before the register, that he or she had not "settled on or improved said land to sell the same on speculation, but in good faith to appropriate the same to his or her own exclusive use and benefit; that he or she had not directly or indirectly made any agreement or contract, in any way or manner, with any person or persons whatsoever, by which the title which he or she might acquire from the government of the United States, should inure, in whole or in part, to the benefit of any person except himself or herself."

3. It was also claimed that the record showed that Shields was the owner of 320 acres of land at the time of asserting this pre-emption right, and was within the exception of the act [5 Stat. 456] providing that "no person who is the proprietor of 320 acres of land in any state or territory of the United States, shall acquire any right of pre-emption under this act."

4. It was also claimed that, Mr. Secretary Thompson having decided against the validity of the entry, and the land having been offered for sale as government land, at which sale the title was acquired by third parties, it was not within the competency of his successor to summarily reverse this decision,

avoid the sale, and issue a patent to Shields.

On these grounds a decree was asked, declaring that the entry by Shields was void, and decreeing that he and his grantees join in a conveyance to the plaintiff.

The defendants insisted that the tract was not within the exception in the act first above mentioned, because:

1. The act of 23d May, 1844 [5 Stat. 657], was a repeal thereof by implication. That act provides that the corporate authorities of a city located on the public lands may enter with the register so much of the town-site as is actually occupied by the town, in trust, for the several use and benefit of the occupants thereof, according to their several and respective interests.

2. That the construction of the act of 1841 [supra] was unreasonable, and involved great inconveniences.

3. That the city was incapable of making this purchase even by a trustee.

4. That the defendants, except Shields, who had parted with all his interest, were bona fide purchasers, for a valuable consideration, without notice.

Mr. Woolworth, for plaintiff.
Mr. Briggs, for defendants.

MILLER, Circuit Justice. It is necessary to fix the point of time at which Shields first asserted a pre-emption claim to these lands, for in the view which we take of the case, upon that depends the validity of his entry, and of the title which was acquired in virtue thereof. The plaintiff, in his bill, insists that Shields did not conceive the idea of asserting a pre-emption right in the land until September, 1857; and supports that position by a detailed statement of the facts connected with his dealings with and in respect of the tract. On the other hand, the defendants, in their answer, insist that Shields acquired a right to pre-empt the land as early as April, 1856, and that he did nothing subsequently to compromise his claim thereto.

From the first, down to September, 1857, the history of these lands, as conclusively shown by this record, is this: At an early day, almost as soon as Nebraska was opened for settlement, and very shortly after the city of Omaha was planted, certain parties, taking to themselves the style of the Omaha City Company, divided the lands here in dispute into lots, and made a plat of them. They did not apportion the lots among themselves, but they issued to third parties certificates, which, upon a distribution afterwards to be made, entitled the holder of each to a certain number of lots. When this distribution among the holders of the certificates took place, Shields held one numbered 416, and drew certain lots in block 128½, and, by exchange of lots with one Mitchell, who, as the holder of another certificate, drew others in the same block, he became possessed of a right (whatever that was) to ten lots all

lying together. And by deeds from the company to himself and to Mitchell, and from Mitchell, Shields acquired such a title as could then be made to this parcel of land, consisting of the ten lots. This was before the government had provided any means by which settlers or others could acquire its title to any lands in Nebraska.

It was under this title, or under the right or claim thus derived, that Shields, in 1856, entered, built a house, and took up his residence upon this parcel of the quarter section. It is a significant circumstance, that he built his fence, enclosing the parcel, on the line of these ten lots, and the streets by which they were bounded.

He continued to live here for some time, until he sold out to one Beesom. In the deed which he then made to Beesom, he describes the property sold as so many lots, giving their numbers, in block 128½, in the city of Omaha. Thereupon he removed from Omaha, and afterwards to a tract of land in Sarpy county. Some time in the summer of 1857, he filed with the register of the land office his statement of intention to pre-empt the tract of land in Sarpy county on which he lived, and described himself therein as "of Sarpy county." In September of that year, he re-purchases from Beesom the lots in block 128½, and in the conveyance which he received, the premises conveyed are described as lots, as they had been conveyed by him in his deed to Beesom. Thereupon he asserts a right to the whole quarter section.

Passing by all consideration of the relative rights and duties of Shields and the city company, arising out of the manner in which he went into the occupancy of the lands, and also of the effect of his filing on one tract while maintaining a claim of pre-emption to another, we need here merely direct our attention to the inquiry, what was Shields' intentions in respect of the quarter section, as shown by his conduct? We see him entering into a very small portion of the tract, under an apparent claim inconsistent with the idea of a pre-emption right. We see him selling and re-purchasing the lots as town lots, which can hardly be reconciled with the claim to the tract as agricultural land. We see him, in a most important document, made and filed in a public office, in order to acquire title to another tract, describing himself as residing elsewhere. We see him removing from the land which he here claims, continuing absent therefrom a much longer period than he ever, from first to last, resided upon it, and during all this time he never asserts any claim to the tract under the pre-emption law. When these facts are considered in connection with the requirement of continued and bona fide residence on the tract claimed by a settler under the beneficent privileges granted by the pre-emption law, the conclusion is irresistible, that he had no idea of asserting, or of having any other rights than such as he had in the lots alone, and under the city company's deeds. He certainly never asserted any right of pre-emption to the whole quarter section.

Indeed, the force of the facts above enumerated was so strong, that upon the argument the counsel for the defendants was constrained to concede, notwithstanding the allegations in the answer, that it was not until September, 1857, that Shields acquired or asserted a right of pre-emption in the tract.

This matter, then, being disposed of, the other facts, so far as they are necessary to the decision, are undisputed. These are the following:

In February, 1857, the city of Omaha was incorporated. Nearly 3000 acres were included within the corporate limits. The tract here in question was a part of these lands. In September following, Shields filed with the register of the land office his written declaration that he claimed and intended to pre-empt the west half of the south-west quarter of section 10, and the north half of the north-west quarter of section 15, in township 15 north, range 13 east of the sixth principal meridian; and in November of the same year, he made proof to the satisfaction of the register and receiver of those facts required to be shown by pre-emption claimants, took the prescribed oath, and effected his entry of the tract, and received the usual patent certificate therefor. When the papers in the case were, by the local officers, according to the usual course of such business, transmitted to the commissioner of the general land office, he remitted them to the local office with a direction that the right of Shields should be re-investigated. This was done, and, as this record shows, very thoroughly done. It resulted in a letter addressed by the local officers to the commissioner, holding adversely to the validity of the entry, upon several grounds. The commissioner affirmed this decision, and the entry was, in the summer of 1858, vacated. From this decision an appeal was taken to the secretary of the interior, who, at that time, was the Honorable Jacob Thompson, and he affirmed the two previous decisions. The lands were thus, so far as the authority of the land department extended, restored to the body of the public domain. Thereupon, and on the 10th day of July, 1860, in pursuance of an order of the commissioner, the local officers sold the tract at public auction, as government land. One Smith bid in one half, and one Monell the other half, of the quarter section. The lands in question in this suit are a part of the half bidden in by Monell. He did not buy for himself, but in trust, partly for persons claiming lots under the deeds of the Omaha City Company, and partly for the city of Omaha. This plaintiff held deeds from this company to some of the lots, and purchased a part of the tract from the city; and Monell accordingly conveyed the lots to him, as a party in trust, for whom the purchase to that extent was made, and the parcel sold to him by the city, by direction of the city.

These deeds were made in January, 1861. The plaintiff entered into the premises shortly afterwards, and has expended considerable sums in their improvement.

On the 13th day of December, 1861, the Honorable Caleb Smith having succeeded Mr. Thompson as secretary of the interior, without any further hearing of the parties, and upon the record which was before his predecessor, reversed all the decisions which had been made upon the question of the validity of Shields' entry, and, as a consequence, such action vacated the public sale, and ordered that a patent issue to Shields. Accordingly, on the 24th of February, 1863, without any further proceedings, the patent was issued to him. These are the undisputed facts, and in the view which we take of the case, are sufficient for its determination.

Several objections are urged to the plaintiff's title, to which our attention should be first addressed; for whatever may be the validity of the title alleged by the defendants, if objections may be urged against that of the plaintiff which are fatal to it, no further inquiry is necessary.

One of these objections is, that at the time of the public sale at which Monell purchased the land, he, the plaintiff, and others, entered into a combination to prevent competition among bidders. This allegation in the answer is not supported by proof; but even if it were, it is not matter of defence of which these parties can in this proceeding avail themselves. The charge in the answer is in substance this: That before the sale a large number of persons entered into an unlawful combination to protect Monell in bidding in one half, and Smith the other half of the quarter section, at $1.25 per acre; that the plans in that behalf of these parties were matured at secret meetings; that the lands were at the time worth $50 per acre, and this conspiracy was formed to defraud the United States of a large sum of money; that these parties attended the sale, many of them armed, and by violent threats intimidated many persons who were desirous of bidding on the lands, so that they did not do so; and thus Monell and Smith were enabled to, and did, bid the lands in at the minimum price.

Now, it is apparent that all that this charge, as made in the answer, tends to, is to show that the United States were defrauded by this proceeding. These defendants did not suffer therefrom. But the United States do not complain. On the other hand, with every means of inquiring into such a matter in their own tribunals, by their own officers, they accepted the sale as a fair one. It was never set aside except as a necessary consequence of reinstating a prior entry. These defendants cannot avail themselves of an injury, which they charge another has suffered, when the injured party not only does not complain, but even affirms the act by which it was inflicted. Especially can they not do so, when they aver such matter, not in support of their own right, but in order to break down the right of their adversaries. Fackler v. Ford, 24 How. [65 U. S.] 322.

Another objection urged against the plaintiff's title is, that as the city, as a municipal corporation, was incapable of making this purchase directly, it could not do so indirectly by the aid of a trustee, and therefore the sale to Monell was void. It is true that, at the common law, a municipal corporation can only take and hold the title to such lands as its corporate necessities require. Nor do I think it can do indirectly what it cannot do directly. It cannot take the title in the name of another in trust for itself, and thus secure to itself the avails of the void purchase. But in Nebraska that rule does not obtain. It has been changed by statute. It is provided that towns and cities "may grant, purchase, hold, and receive property, both real and personal, within such town, and lease, sell, and dispose of the same for the benefit of the town." In that view the objection is not tenable.

But to what does the objection go? To the trust. Were it valid, it would avoid the trust. The sale itself and the title acquired under the sale, and the conveyance in pursuance of the sale, would all still remain. The estate would be vested in the trustee just as absolutely as if he had purchased for himself. He might have repudiated his obligations to the city as his cestui que trust, and yet retain the title to be conveyed and disposed of effectually by him. It is not necessary to inquire what his rights would have been, had he acquired them by a conveyance expressing a void trust on its face. Here we have a conveyance to Monell, absolute on its face, the consideration for which, so far as this record shows, passes from him, and not from the city. The trust is evidenced by an agreement in that behalf between it and him. He took the title. And he has conveyed to this plaintiff. It is not material to inquire whether the trust was valid or not. Irrespective of that question, he took, and he conveyed to this plaintiff, a good title.

It now becomes necessary to inquire whether the title alleged by the defendants under Shields' entry was valid. Being prior in time to Monell's purchase, it is to be upheld, unless that entry is affected by some radical infirmity. The facts are very few and simple. They are these:

1. The city was incorporated, and these lands included within the corporate limits, in February, 1857.

2. Shields had no pre-emption claim to them prior to September, 1857.

3. The act granting to him such right, if any he had, provides that a party of the character therein described may pre-empt any portion of the public lands, except such as are included within the limits of an incorporated city.

It does not need a single word to show that the law on its face does not authorize a pre-emption entry of the lands here in

question. But it is insisted, on behalf of the defendants, that this exception in the law is inoperative here. One reason alleged is, that the mischiefs of such a provision are so serious that congress could not have intended the effects which would follow. It is said that the state or territorial legislature, in which rests the authority of incorporating cities, might, by unduly extending their limits, exclude large bodies of land fit only for agricultural purposes from the beneficent operations of the pre-emption act, and defeat the object of congress.

We do not stop to repeat what has been said a great many times of the duty of the court when applying to a case a provision of a statute, the terms of which are clear and precise, and when urged to nullify it by considerations of mischief growing out of it. Here we think the mischiefs are imaginary rather than real. If the local legislature were so unwise as to endeavor to defeat the purposes of a law enacted for the benefit of its constituents, congress could readily, and certainly would immediately, remedy the evil. And it is not conceivable that the local legislature would ever attempt any such thing.

The pre-emption law was enacted for the benefit of the settlers in the new states and territories. It offers to that adventurous and worthy class of citizens the advantages of selecting, and securing in advance of the speculator, the more desirable tracts in the new region. And the uniform policy of the land department is to retain the public lands in such a situation for a long time, in order to give those who are willing to encounter the hardships and dangers of frontier life, an opportunity to make selections and to settle upon them, and make payment for them at the minimum price, before any portions of such lands are offered to purchasers in general. Accordingly, such settlers constitute almost the whole body of citizens who settle in such regions. It is not conceivable that they would deliberately devise a measure which would defeat an enactment by which valuable privileges are secured to themselves, and by which the region of country in which they live would be populated and improved. Precisely this argument was urged in the case of Gilman v. Philadelphia, 3 Wall. [70 U. S.] 713, 731. It was held untenable there, for the reasons indicated above.

It is insisted that the clause in the law containing this exception is repealed by the provision in the act organizing the territory, that its legislature should not have authority to interfere with the primary disposal of the soil. It is said, that if the territorial legislature can, by incorporating a city, withdraw the lands included within its limits from the privileges of pre-emption, it may, and it does, thereby interfere with the primary disposal of the soil. This argument is specious rather than sound. If the provision of the organic act has the effect claimed, it is because it repeals the provision of the pre-emption law by implication. Between these two provisions there is no such repugnance that they cannot both stand. So that we cannot imply a repeal of the former by the latter. U. S. v. 10,000 Cigars [Case No. 16,-451].

This provision in the act is the same as is found in most of the acts admitting new states into the Union. It is intended to withdraw from the local legislatures some special matter of general concernment, and indicates a settled policy in respect thereof.

In 1802, in the act admitting Louisiana, the words used were, "They," that is the people of the new state, "for ever disclaim all right or title to the waste or unappropriated lands lying within the said territory; and the same shall be and remain at the sole and entire disposition of the United States" (2 Stat. 642). And the very phrase here employed by congress appears in the act for the admission of Michigan, passed on the 15th of June, 1836 (5 Stat. 59), and will be found in all similar acts since passed. Having its origin in some reason of general application, it has been felt as a necessary, and adopted as an approved, provision in the legislation of congress.

One or two considerations will disclose this. To incorporate a city located on the public lands, however contracted its limits, is to withdraw from the operation of the pre-emption law lands included within them. If including public lands within the limits of an incorporated city is an interference with the primary disposal of the soil, then the new states cannot pass an act incorporating a city located on the public lands. But this power in the states was never denied. It has always been exercised by them exclusively of the federal government. Indeed, the legislation of congress concedes the power. So it cannot be that incorporating a city on the public lands interferes with the primary disposal of the soil, even though it has the effect to withdraw the lands within its limits from the operation of the pre-emption law.

I have thus far spoken of the power of states, and am reminded that the charter of Omaha was enacted by a territory. But we have already seen that the provision has its place in acts admitting states, as well as in acts organizing territories; and that it is universally used, on account of a general policy. So the argument in the one case is of equal force in the other.

An act incorporating a city which is located on the public lands, does not, by its own force, withdraw lands from pre-emption. That effect is produced by the congressional provision, and is remote, indirect, and only consequential.

These obvious considerations show very clearly that when congress provided that the territory should not interfere with the primary disposal of the soil, it did not intend to

deny the authority to incorporate a city on the public lands.

But this exception in the pre-emption law was not inserted with any view whatever to the extent of the corporate limits of a city, whether they should be reasonable or unreasonable. It was assumed that there was a class of lands which the local authorities would regard as more desirable for town occupation than for agricultural use. Without any inquiry as to the correctness of the opinion on that subject of those who were on the ground, and without convenient means of answering such an inquiry, congress deemed the short way the best way,—to exclude them all from the operation of the act by a general rule. And when, with such a provision of statute before it, and with such obvious reasons for enacting it, congress proceeded to organize the territory with the clause which is before us, it is unreasonable to suppose that it intended to repeal or modify the former rule.

The clause in the organic act was intended to forbid the territorial legislature passing any law to dispose of the public lands as if on its own authority, or intermeddling with the mode by which the general government should dispose of them, or assuming any authority or jurisdiction in respect of that business. It was not intended to deny authority to pass a law which the territory alone could intelligently enact.

Clearly the position of the defendants on this ground is untenable.

But we are met by still another reason against giving effect to the exception in the pre-emption law. It is, that the act of May 23, 1844 (5 Stat. 657), restricts the corporate limits of a city to 320 acres.

All that that act provides, so far as the matter here in hand is concerned, is that any portion of the public land actually occupied as a town-site, may, to the extent of 320 acres, be by the corporate authorities entered at the proper land office and at the minimum price; in trust for the occupants. Prior to the passage of that act, there was no mode provided for the occupants of such towns acquiring their titles except at the public sale.

The public sales of lands are often delayed long after a large section of territory has been opened for settlement. This is in order to enable settlers to enjoy the preference in acquiring the more valuable tracts. And these sales are made in parcels of not less than 40 acres each, and therefore do not afford an appropriate means to claimants of small lots for acquiring title thereto. Congress accordingly provided this mode of relief to such parties, expressly restricting the advantages which it granted to lands actually occupied, and to 320 acres. The status of the remaining lands within the corporate limits was untouched. They could not be entered under this act, nor could they any more after than before the passage of it be pre-empted by an individual. The title to them could only be acquired at public sale.

No one of the reasons urged on behalf of the defendants against giving effect here to the clear and express provision of the law, that lands within the limits of an incorporated city should not be subject to pre-emption, is tenable. But if we look to the policy of the provision, we are led to the same conclusion.

Whenever a town springs up upon the public lands, adjoining lands appreciate in value. The reasons are obvious, and the fact is well known. So too when a railroad is built through a section of country, the same result follows. So too in respect of lands which have been reserved for the use of an Indian tribe, when the Indian title is extinguished, the same may be said. While such lands are held as a reserve, population flows up to their boundaries and is there staid; it of course constantly grows more and more dense, so that when the reserve is vacated, the lands have increased in value, and are always eagerly sought after. The other classes of lands mentioned in the exception, as for instance those on which are situated any known salines or mines, have some intrinsic value above others.

Now all these classes of lands are excepted from the operation of the act, and for the one common and obvious reason, that being of special value, the government desires to retain the advantage of their appreciation, and is unwilling that any individual, because of a priority of settlement, which certainly can be of but brief duration, should, to the exclusion of others equally meritorious, reap benefits which he did not sow.

This is as true of lands within the limits of an incorporated city, as of any other of the classes mentioned in the exception. And it is no answer to this view to suggest that lands thus excluded from pre-emption are not occupied for a town. They are included within its limits by the local legislature, because likely to be required for such occupancy. And it is this fact, and their proximity to the town, which gives them special value. This very circumstance of their situation brings them into the classes of lands mentioned.

The lands were not, at the time Shields first asserted a pre-emption claim thereto, subject to entry under the act, and the entry which he made was illegal and void.

It is also insisted against the validity of this entry, that Shields personally was within one of the exceptions which relate to the character of the pre-emption claimant, and was therefore incapable of making an entry under the act. It is alleged that he was the owner of 320 acres of land. This is denied very positively in the answer. The proof consists of many circumstances tending, it is claimed, to establish the fact. Perhaps so. But against the denial it is not conclusive.

Again, the entry is assailed on the alleged ground that he entered into a contract with Test, by which the title which he should acquire should inure to Test's benefit. It is

insisted that Shields re-purchased the property from Beesom with money furnished to him by Test for the purpose, and that circumstance, taken in connection with the further fact that he conveyed an undivided half of the quarter section to Test, the second day after he made his entry, supports the allegation. But we have here, too, the positive denial in the answer, which we think is not overcome by the plaintiff's proofs. It is unnecessary to decide these questions. Let it be understood that we place our decree upon the ground that the land was not subject to pre-emption, and that for that reason the entry made by Shields was void.

It is further insisted on behalf of the defendants, that they are bona fide purchasers, and that they, as such, are entitled to the protection of the court. I think it pretty clear that some at least of these defendants purchased and paid their money without any knowledge in fact of any defect in the title. Yet they are not bona fide purchasers, for a valuable consideration, without notice, in the sense in which the terms are employed in courts of equity. And this for several reasons.

They all purchased before the issue of the patent. The more meritorious purchased after the entry had been assailed, and decided against by the land office. But that is a circumstance not material to this consideration. Until the issue of the patent, the legal title remained in the United States. Had his entry been valid, Shields would have taken only an equity. His grantees took only an equity. They did not acquire the legal title. And in order to establish in himself the character of a bona fide purchaser, so as to be entitled to the protection of chancery, a party must show that, in his purchase, and by the conveyance to him, he acquired the legal title. If he have but an equity, it is overreached by the better equity of his adversary.

Besides, these defendants were bound to know the law. They were bound to know that these lands were within the limits of the city; and that lands within the limits of a city cannot be pre-empted. Knowing these facts, they knew that Shields' entry was void. They did not purchase without notice.

Again, the defect in the title was a legal defect; it was a radical defect. It was as if no entry had ever been made. By it Shields did not take even an equity. After he had gone through the process of making the entry, after he received the patent certificate, Shields had no more right, or title, or interest in the land than he had before. And as he had none, he could convey no interest in the land. By the deed which he made, and by the successive deeds which they received, his grantees took no more than he had, which was nothing at all.

In order to the maintenance of this defence, there must subsist an interest which the law approves and will support, and we have shown in this opinion that that never existed.

There must be a decree according to the prayer of the bill. Decree accordingly.

As to form of decree to be entered in such a case, see Silver v. Ladd, 7 Wall. [74 U. S.] 219.